## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COTTMAN AVENUE PRP GROUP,                    )
BALTIMORE GAS & ELECTRIC                     )
COMPANY, CONSOLIDATED EDISON                  )
COMPANY OF NEW YORK, INC.,                    )
JERSEY CENTRAL POWER & LIGHT                  )
COMPANY, LONG ISLAND LIGHTING                 )
COMPANY d/b/a LIPA, METROPOLITAN             )
EDISON COMPANY, ORANGE AND                    )
ROCKLAND UTILITIES, INC., PECO               )
ENERGY COMPANY, POTOMAC                       )
ELECTRIC POWER COMPANY, PPL                   )     Case No.: _____
ELECTRIC UTILITIES CORPORATION,               )
PUBLIC SERVICE ELECTRIC AND GAS              )
COMPANY and VIRGINIA ELECTRIC                 )
AND POWER COMPANY,                            )
                                              )
              Plaintiffs,                     )
                                              )
v.                                            )
                                              )
AMEC FOSTER WHEELER                           )
ENVIRONMENTAL &                               )
INFRASTRUCTURE INC.,                          )
                                              )
              Defendant.                      )

## **COMPLAINT**

The Cottman Avenue PRP Group, Baltimore Gas & Electric Company, Consolidated Edison Company of New York, Inc., Jersey Central Power & Light Company, Long Island Lighting Company d/b/a LIPA, Metropolitan Edison Company, Orange and Rockland Utilities, Inc., PECO Energy Company, Potomac Electric Power Company, PPL Electric Utilities Corporation, Public Service Electric and Gas Company and Virginia Electric and Power Company, by counsel, state for their Complaint against AMEC Foster Wheeler Environmental & Infrastructure Inc. as follows:

## NATURE OF THE ACTION

1.    This is a civil action for monetary and declaratory relief brought pursuant to the common law of the Commonwealth of Pennsylvania and Section 113 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9613, as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, 100 Stat. 1613 (1986) ("CERCLA").  Plaintiffs seek to recover from Defendant all costs and damages that they have incurred to respond to the release or threatened release of hazardous substances at the Metal Bank Cottman Avenue National Priorities List Site located in Philadelphia, Pennsylvania (the "Site") attributable to a defective remedial design prepared by Defendant.  Plaintiffs also seek a declaration of Defendant's liability for future response costs and damages that Plaintiffs will incur at the Site due to Defendant's defective remedial design.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 & 9613, and 28 U.S.C. § 1331.  The Court also has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy in this matter exceeds $75,000, exclusive of interest and costs, and the Plaintiffs, on the one hand, and the Defendant, on the other, are citizens of different states.

3.    Venue is proper in this Court under 42 U.S.C. § 9613(b).  Furthermore, the acts and omissions at issue in this case and the location of the Site are within this district.  28 U.S.C. § 1391(b)(2).

## PARTIES

4.     Plaintiff Cottman Avenue PRP Group (the "Group") is an *ad hoc*, unincorporated group of corporations that the United States Environmental Protection Agency ("EPA") identified in the 1980's as potentially responsible parties ("PRPs") under CERCLA at the Site.

5.     Plaintiff Baltimore Gas & Electric Company ("BGE") is an electric utility incorporated and with its principal place of business in the state of Maryland.  BGE is a member of the Group.

6.     Plaintiff Consolidated Edison Company of New York, Inc. ("Con Ed") is a New York corporation with its principal place of business in the state of New York.  Con Ed is a member of the Group.

7.     Plaintiff Jersey Central Power & Light Company ("JCPL") is an electric utility incorporated and with its principal place of business in the state of New Jersey.  JCPL is a member of the Group.

8.     Plaintiff Long Island Lighting Company d/b/a LIPA ("LIPA") is a New York corporation with its principal place of business in the state of New York.  LIPA is a wholly-owned subsidiary of the Long Island Power Authority, a corporate municipal instrumentality of the state of New York and a political subdivision of the state.  LIPA is a member of the Group.

9.     Plaintiff Metropolitan Edison Company ("MetEd") is an electric utility incorporated and with its principal place of business in the commonwealth of Pennsylvania.  MetEd is a member of the Group.

10.    Plaintiff Orange and Rockland Utilities, Inc. ("ORU") is a New York corporation with its principal place of business in the state of New York.  ORU is a member of the Group.

11.    Plaintiff PECO Energy Company ("PECO") is an electric utility incorporated and with its principal place of business in the commonwealth of Pennsylvania.  PECO is a member of the Group.

12.    Plaintiff Potomac Electric Power Company ("PEPCO") is an electric utility incorporated in the commonwealth of Virginia and in the District of Columbia.  Its principal place of business is in the District of Columbia.  PEPCO is a member of the Group.

13.    Plaintiff PPL Electric Utilities Corporation ("PPL") is an electric utility incorporated and with its principal place of business in the commonwealth of Pennsylvania.  PPL is a member of the Group.

14.    Plaintiff Public Service Electric and Gas Company ("PSEG") is an electric utility incorporated and with its principal place of business in the state of New Jersey.  PSEG is a member of the Group.

15.    Plaintiff Virginia Electric and Power Company ("VEPCO") is an electric utility incorporated and with its principal place of business in the commonwealth of Virginia. VEPCO is a member of the Group.

16.    Defendant AMEC Foster Wheeler Environmental & Infrastructure Inc. ("AMEC FW") is the surviving division of AMEC Earth and Environmental, Inc. ("AMEC EE") following a 2013 merger.  AMEC EE was the successor to Ogden Environmental and Energy Services Co., Inc., following a 2000 acquisition.  AMEC FW is incorporated in the state of Nevada.  Its principal place of business is in the state of Georgia.

## FACTS

17.    This case concerns defective engineering and remedial design work relating to the Site that AMEC EE performed on behalf of the Group and its members.

18.    As described below, AMEC EE designed and oversaw the engineering and construction of a sheet pile wall at the Site that EPA determined was not fit for the intended purpose of preventing the migration of contaminants from the Site to the Delaware River.  As designed by AMEC EE, the sheet pile wall released and threatened to release hazardous substances into the environment.

### I. Background

19.    Beginning in 1962, the Site was used for scrap metal storage.  From approximately 1968 or 1969 until 1973, The Metal Bank of America, Inc. ("Metal Bank") conducted transformer salvage operations at the Site.  Transformer oil was drained on a concrete pad that was connected to an underground storage tank.  Spills of the oil and possibly a rupture of the underground storage tank caused soil and groundwater contamination at the Site.

20.    EPA has documented contamination at the Site resulting from Metal Bank's operations, including polychlorinated biphenyls ("PCBs"), polycyclic aromatic hydrocarbons ("PAHs") and other hazardous substances.

21.    In accordance with the terms of an administrative order on consent issued by EPA, members of the Group performed a remedial investigation and feasibility study ("RI/FS") at the Site between 1991 and 1994.

22.    In 1997, EPA issued a Record of Decision ("ROD") that sets forth its preferred remedy for the contamination at the Site.  Exhibit 1.

23.    The ROD calls for "[i]nstallation of an oil collection system consisting of a sheet pile wall around the southern and western perimeter of the property; interceptor trenches with oil-water separators and sump pumps, or similar collection devices, inside the wall to prevent oil from migrating to the Delaware River … and off-site disposal of collected oil in accordance with RCRA [Resource Conservation and Recovery Act] and TSCA [Toxic Substances Control Act] requirements." ROD at 1-2.

24.    The ROD explains that "[m]igration of contaminants from the Southern Portion of the property into the adjacent aquatic environment is prevented by the oil collection system and associated sheet pile wall along the property perimeter." ROD at 44.

25.    The ROD establishes as a specific performance standard that the "sheet pile wall shall be installed around the southern and western perimeter of the property adjacent to the Delaware River to prevent erosion of fill materials into the river and facilitate installation of the oil collection system." ROD at 54.

26.    The ROD also establishes as a specific performance standard conditions for disposing of the oil collected by the oil collection system associated with the sheet pile wall "in accordance with Pennsylvania Residual Waste Management regulations." ROD at 54.

27.    In 1998, EPA issued an administrative order ("Administrative Order" or "AO") to eight members of the Group and four other parties, requiring them to prepare a remedial design of the ROD remedy for the Site.

## II.    1998 Contract and Required Work

28.    In July 1998, the Group issued a request for proposal ("RFP") to several environmental engineering firms. AMEC EE's predecessor Ogden Environmental and Energy Services Co., Inc. was one of these firms.

29.    Attachment C to the RFP is the Technical Scope of Work Requirements for the Site. Ex. 2.  It summarized the EPA-approved remedy for the Site as including, among other things, "[p]lacement of a sheet pile wall with oil/water separators to prevent any remaining PCBs from migrating to the Delaware River through either surface erosion or groundwater." RFP Attachment C at § 2.1.

30.    Attachment C to the RFP also provided that "[s]tormwater management controls shall be designed to protect the site and to minimize further migration of hazardous substances.  Erosion control measures, including silt fencing, shall be designed to prevent erosion and uncontrolled movement of contaminated soils and sediments from areas impacted by excavations." *Id.* at § 2.2.2.3.

31.    Attachment C to the RFP required the successful bidder to use EPA's "*Superfund Remedial Design and Remedial Action Guidance*, dated June 1986 and *Guidance for Scoping and Remedial Design*, dated March 1995 … as guidance for preparing the scope of work," and for preparing design submittals. *Id.* at § 3.0.

32.    Attachment C to the RFP also provided that the sheet pile wall/oil collection system called for in the RFP was to "be installed at the Site in accordance with the ROD." *Id.* at § 2.3.

33.    In July 1998, AMEC EE, along with "team partner" Hart Crowser, Inc., submitted a proposal to the Group ("Proposal").  Ex. 3.

34.    In its Proposal, AMEC EE expressed "an intimate knowledge of the requirements of implementing this design project," based on its "review of the ROD, Administrative Order and the Scope of Work."  Proposal at 3.

35.    AMEC EE stated in its proposal that it understood that the design project required "[p]lacement of a sheet pile wall with oil/water separators to prevent any remaining PCBs from migrating to the Delaware River through either surface erosion or groundwater." *Id.*

36.    AMEC EE proposed a conceptual design "for the objective of collecting LNAPL and preventing its migration to the Delaware River," to include "[a] physical barrier, consisting of either a sheet pile wall or a high density polyethylene (HPDE) geomembrane curtain." *Id.* at 15.  "LNAPL" means Light Non-Aqueous Phase Liquid.

37.    AMEC EE proposed this design as part of the "Interceptor Trench" principal design component. *Id.* at 24.

38.    As proposed by AMEC EE, the "Interceptor Trench" would be engineered to consist of a "physical barrier" and "LNAPL collection system" to include a "collection/storage/treatment system." *Id.*

39.    As proposed by AMEC EE, design work for the "Interceptor Trench" would "include a sheet pile cutoff wall, or if determined to be practical and feasible, an HPDE curtain, interceptor trench or horizontal well system, sumps, pumps, controls, LNAPL collection tank and building." *Id.*

40.    In August 1998, AMEC EE entered into a contract with the Group to serve as the environmental engineering firm that would prepare the remedial design under the EPA order (the "1998 Contract").  Ex. 4.

41.    AMEC EE agreed "to perform the … Services … as set forth in Attachment C to the RFP and" AMEC EE's "proposal, as amended."  1998 Contract at ¶ 3.

42.    AMEC EE warranted that it understood "the currently known and potential hazards and risks to human beings, property and the environment presented by hazardous substances at the Site." *Id.* at ¶ 12(i).

43.    AMEC EE warranted that it was "experienced, properly qualified, registered, equipped, organized and financed to perform Services under this Agreement, is engaged in the business of hazardous substance investigation and cleanup, and has developed the requisite experience for investigation and cleanup of such substances." *Id.* at ¶ 12(ii).

44.    AMEC EE warranted that "key personnel with expertise in hazardous waste site investigation and clean-up," identified in AMEC EE's proposal, would "be dedicated to the Project." *Id.* at ¶ 12(iii).

45.    AMEC EE warranted that it would "conduct its activities in a safe and professional manner in compliance with EPA's Administrative Order and all applicable statutes, ordinances, orders, rules and regulations of the federal, state and local governments in whose jurisdiction such activities are performed." *Id.* at ¶ 12(iv).

46.    AMEC EE warranted that it would "conduct its activities in accordance with accepted professional standards for engineering and scientific practices adopted by environmental firms performing services of a similar nature in effect at the time Services are rendered." *Id.*

47.    AMEC EE warranted its "Services to be accurate and free from defects due to materials, workmanship and/or design in accordance with such professional standards." *Id.*

48.    AMEC EE warranted that, "if any of its completed Services fail to conform to the above professional responsibility standard," it would, "at its expense, perform corrective Services of the type originally performed as may be required to correct any such defective

9

services of which" AMEC EE "is notified by the PRP Group in writing at any time during the performance of the Project." *Id.* at ¶ 12(vi).

49.   AMEC EE agreed to "defend, indemnify and hold harmless PRP Group from and against any and all claims, losses, damages, liability, costs or actions, including, without limitation, reasonable attorney fees and other costs and expenses ('damages') to the extent arising out of, resulting from or in connection with any unlawful, negligent or willful misconduct or omission by" AMEC EE, "its agents, employees or subcontractors, in the performance of this Agreement." *Id.* at ¶ 15.1.

50.   AMEC EE agreed to secure and maintain insurance policies, including comprehensive general liability ("CGL") insurance "protecting [AMEC EE] and PRP Group, and naming PRP Group and EPA as additional insureds." *Id.* at ¶ 20.   Supplementary coverage under the CGL policy was required for "Contractual Liability to cover liability assumed [by AMEC EE] under this Agreement." *Id.* at ¶ 20.ii.

51.   AMEC EE's insurance obligations also included "Professional Errors and Omissions Insurance covering Engineering Design" and "Excess Liability Insurance … over the general liability, automobile liability and employer's liability coverages." *Id.* at ¶ 20.iv-.v.

52.   AMEC EE agreed that the indemnification provision described in paragraph 49 above would "not be limited by the amount of the compensation paid to" AMEC EE, or the amount of AMEC EE's "applicable insurance coverage. *Id.* at ¶ 15.2.

53.   AMEC EE also agreed to oversee "final disposal of [certain] waste materials" from the Site. *Id.* at ¶ 18.

54.   AMEC EE performed the remedial design work described in the 1998 Contract between 1998 and 2002.

55.   The remedial design work by AMEC EE included the collection of data and engineering analyses addressing the various elements of the ROD remedy, including the sheet pile wall.

56.   One of AMEC EE's deliverables under the AO and the 1998 Contract was a Pre-Design Investigation ("PDI") Report that documented certain conditions at the Site, including the presence of hazardous substances at the Site and geotechnical data relevant to the Interceptor Trench remedial design component.

57.   In December 2002, AMEC EE issued a final remedial design report under the Administrative Order.

### III.   Litigation Initiated by United States Against Site Owners and Operators

58.   Between 1980 and 2006, the United States pursued judicial remedies against the owners and operators of the Site.  The members of the Group were third-party defendants in the litigation.

59.   The judicial proceeding conducted in parallel with EPA's administrative proceeding included a 2002 trial before Chief Judge Giles of this Court.

60.   Following the trial, the Court issued an opinion finding the former owners and operators of the Site to have liability for contamination at the Site under CERCLA and RCRA. *United States v. Union Corp.*, 259 F. Supp. 2d 356 (E.D. Pa. 2003).

61.   The Court found that the PRP Group's RI/FS "documented … contamination by PCBs, TPH, PAHs and other hazardous substances at the Site.  Pockets or layers of oil beneath the ground surface were found to contain PCBs at concentrations in the range of 520 ppm to 1,090 ppm." *Id.* at 371-72 (internal citation omitted).

62.    The Court found that the PDI submitted to EPA by the PRP Group pursuant to the Administrative Order "confirmed the existence of a layer of oil floating on the groundwater table beneath the Southern Area and further delineated the extent of PCB contamination at the Site." *Id.* at 373 (internal citation omitted).

63.    The Court found that "contaminants can be found on the [Site] and in the adjacent mudflats and river sediments." *Id.* at 378 (internal citation omitted).

64.    The Court found that "oil has found, and continues to find, pathways from the ground and groundwater through the rip rap, upper and lower and into the beach and mudflat areas." *Id.*

65.    The Court retained jurisdiction to determine appropriate remedial measures to address the contamination at the Site. *See id.* at 364 (explaining Court's decision as disposing of Phase One of the trial (concerning defendants' liability "and whether response costs were incurred by the Government") and requiring subsequent Phase Two (to "determine whether the Government's response costs, if any, were reasonable and recoverable, as well as the scope of any further remedial action") and Phase Three (to "determine the liability, if any, of the third-party defendants," *i.e.*, the members of the PRP Group)).

### IV.    2003 Contract and Required Work

66.    To assist the Group following submittal of the December 2002 final remedial design report, in the judicial proceedings and for other purposes, AMEC EE and the Group entered into a new professional services agreement in April 2003 ("2003 Contract"). Ex. 5.

67.    AMEC EE's obligations, warranties, and promises under the 2003 Contract are substantially identical to those described in paragraphs 3, 5, 6, 7, 12, 15 and 20 of the 1998 Contract.

68.   In 2004, representatives of the United States and the Group successfully negotiated certain changes to the ROD remedy for the Site.  Those changes were memorialized in a Revised Remedial Plan.  Ex. 6.

69.   The Revised Remedial Plan calls for "[i]nstallation of a sheet pile wall at the southwestern corner of the Site."  Revised Remedial Plan for Metal Bank Superfund Site at 1 (June 29, 2004).  The wall was to "be installed around the southern corner of the Site as depicted in … the Final Design."  *Id.* at 2.

70.   The Revised Remedial Plan also calls for the excavation and offsite disposal of previously identified "hot spots" in the southern area of the Site in which soils contained PCBs at concentrations above 25 parts per million (ppm).  *Id.* at 1; *see also id.* at 2-6 (addressing individual hot spots).  The Revised Remedial Plan provided for soils containing PCBs at concentrations below 25 ppm to remain in the southern area of the Site under a soil cover, prevented from migrating or eroding into the Delaware River by the sheet pile wall.  *Id.* at 2, 5.

71.   As part of a global settlement of the judicial proceeding before Chief Judge Giles, the members of the Group entered into a consent decree with the United States.  Ex. 7 ("Utility CD").

72.   The Utility CD required the Group to revise AMEC EE's December 2002 final remedial design report, to prepare a revised final design incorporating the remedy changes in the Revised Remedial Plan, to obtain EPA's approval of the revised final design, to construct a remedy consistent with that approved design, and to operate, maintain and monitor the constructed remedy.  Utility CD at ¶¶ 11-13.

73.   The Court approved and entered the Utility CD in March 2006.

74.    The Group proposed, and EPA approved, that AMEC EE serve as the Group's remedial design consultant to prepare a revised final remedial design under the Utility CD. *See* Utility CD at ¶ 11.a (obligation to prepare and submit to EPA revised final design).

75.    AMEC EE and the Group amended the 2003 Contract to include AMEC EE's design services under the Utility CD.

## V.    Performance of Work under Utility Consent Decree

76.    AMEC EE performed work on the revised final remedial design during the years 2004-2007.

77.    EPA approved the revised final remedial design by letter dated February 28, 2008. Ex. 8.

78.    To fulfill their obligations under the Utility CD, the Group retained not only AMEC EE to serve as design consultant but also Malcolm Pirnie, Inc. ("MPI") to serve as supervising contractor and Tetra Tech EC, Inc. ("TTEC") to serve as construction contractor. *See* Utility CD at ¶¶ 10.a (supervising contractor), 10.b (other contractors and subcontractors).

79.    TTEC prepared and submitted to EPA a remedial action work plan as required by the Utility CD. *See* Utility CD at ¶ 11.b.

80.    The Utility CD required that the "Remedial Action Work Plan shall be developed consistent with the Revised Final Design and shall provide for construction and implementation of the Remedial Action, as set forth in the Revised Final Design." Utility CD at ¶ 11.b.

81.    EPA approved the remedial action work plan in its letter dated February 28, 2008. Ex. 8.

82.    TTEC began construction of the remedy at the Site on June 30, 2008.

83.    During remedy construction, MPI served as supervising contractor overseeing TTEC's work.

84.    AMEC EE continued to provide design services during construction of the remedy by TTEC.

85.    The Group and its members relied on AMEC EE's design services to fulfill their obligations under the Utility CD, including the obligations to fully perform the remedial action and to attain the performance standards set forth thereunder.  Utility CD at ¶ 50.a.

86.    During remedy construction, the design services AMEC EE provided included periodic review and approval of modifications proposed by TTEC or MPI to the revised final remedial design.

87.    During remedy construction, AMEC EE's services included both review of documents and on-site inspections of the work performed by TTEC and its subcontractors in accordance with AMEC EE's design.

88.    AMEC EE reviewed and approved modifications to the revised final remedial design with respect to construction of the sheet pile wall.  *E.g.*, e-mail from Wyn V. Davies, Malcolm Pirnie, to Sharon Fang, EPA (Sept. 18, 2008) (noting that AMEC EE had "received and approved a submittal from TtEC regarding the use of the pre-cast deadman for all of the sheet pile securing").  Ex. 9.

89.    The Group and its members relied on AMEC EE's review and approval of the construction of the sheet pile wall to fulfill their obligations under the Utility CD, including the obligations to fully perform the remedial action and to attain the performance standards set forth thereunder.  Utility CD at ¶ 50.a.

90.    The Group retained Sevenson Environmental Services of Pa, Inc. ("Sevenson") to complete construction of the remedy during 2009 and 2010.

91.    AMEC EE continued to provide design services during construction of the remedy by Sevenson.

92.    The Group and its members relied on AMEC EE's design services during construction of the remedy by Sevenson to fulfill their obligations under the Utility CD, including the obligations to fully perform the remedial action and to attain the performance standards set forth thereunder.  Utility CD at ¶ 50.a.

93.    During remedy construction by Sevenson, the design services AMEC EE provided included periodic review and approval of modifications proposed by Sevenson or MPI to the revised final remedial design.

94.    During remedy construction by Sevenson, AMEC EE's services included both review of documents and on-site inspections of the work performed by Sevenson and its subcontractors in accordance with AMEC EE's design.

95.    In total, AMEC EE received payments exceeding $3.3 million for its work for the PRP Group under the 1998 and 2003 Contracts.

96.    Sevenson completed construction of the remedy in January 2010.  EPA documented completion of the construction in a Superfund Preliminary Close Out Report in March 2010. Ex. 10.

97.    By letter dated September 20, 2013, EPA approved the Group's Remedial Action Report signifying completion of construction of the remedial action.  Ex. 11.

98.    Since 2010, the Group has performed operation, maintenance and monitoring of the constructed remedy as required by the Utility CD.  Utility CD at ¶ 13.

## VI.   Failure of the Sheet Pile Wall

99.   In the course of monitoring the sheet pile wall, Group consultants and EPA representatives identified unexpected movement of the wall and stresses on features of the wall.

100.   These issues were first identified in late 2012, at which time the source and reason for the problems with the wall were unknown.

101.   To identify the cause or causes of the problems with the wall, the Group retained RA Consultants LLC ("RAC").  RAC performed wall inspections in May 2013, April 2014, and May 2014, and technical analyses in March 2014 and August 2014.

102.   From May 2013 to November 2014, the Group received several wall inspection reports from RAC.  These reports indicated movement of the sheet pile wall toward the river, and damage to walers that make up part of the wall's structure.

103.   On May 29, 2014, counsel for the Group wrote to inform AMEC EE of the movement of the wall and damaged walers.  The Group sought help from AMEC EE to identify the cause(s) of the problems with the wall, and requested "AMEC's input on possible approach(es) to ensure the continued usefulness of the wall." Ex. 12.  At the time of this letter, neither EPA nor the Group had identified the reason why the wall was failing.

104.   AMEC EE did not provide the Group with any assistance and failed to provide a written response to the May 2014 letter.

105.   Not until the summer of 2014 did RAC identify the reason for the failure of the wall. RAC performed a detailed geotechnical analysis, including a thorough review of AMEC EE's remedial design documents.  RAC concluded that the movement of the wall and damaged walers were attributable to flaws in AMEC EE's design.  In particular, RAC found that

AMEC EE had failed to evaluate the structural integrity of the wall during low flow conditions in the Delaware River.  RAC noted that AMEC EE performed an analysis of the wall "as-built" (i.e., as TTEC constructed it) and concluded that construction of the wall was adequate.  RAC discovered that AMEC EE had evaluated the wall at mean high water conditions but had failed to evaluate the as-built wall in mean low water conditions.  RAC performed an analysis of the sheet pile wall for mean low water conditions and found "several modes of failure for the sheet-pile wall including, overstressed tie-backs, overstressed sheet piles, and global stability failure including the dead-man tie rod anchoring system."  Letter from Walter J. Papp, Jr. & Jane Raba of RAC to Joseph Vitale of ENVIRON International at 1-2 (Aug. 24, 2014) (Ex. 13).

106.  RAC was able to conclude from its analysis of AMEC EE's design documents that the wall was failing because it had not been designed properly to perform during low flow conditions in the River.

107.  To repair the wall and remedy AMEC EE's defective design, RAC recommended the placement of riprap on the river side of the wall, the installation of tie-backs and repair of the damaged walers.  *Id.* at 6.  RAC subsequently revised its recommendation by dropping from its repair plan the installation of tie-backs.

108.  On December 12, 2014, counsel for the Group again wrote to a representative of AMEC EE.  Counsel informed AMEC EE that the cause for the problems with the wall was AMEC EE's defective design, specifically the failure to account for stresses on the wall during low flows.  The letter noted that two consultants, working independently, had found the same failing in AMEC EE's design of the wall.  The December 12 letter also notified AMEC EE that RAC had developed plans for repair of the wall, and that EPA had requested

the Group's supervising contractor, ENVIRON, to submit a "Sheet Pile Wall Repair Work Plan." Ex. 14.

109.  Counsel for the Group informed AMEC EE in the December 12, 2014 letter that AMEC EE "is responsible for the damage to the sheet pile wall through the defective design of the wall for low flow conditions." *Id.* at 2.  The letter identified AMEC EE's liability under both the 1998 and 2003 Contracts and CERCLA.

110.  Counsel for the Group demanded that AMEC EE acknowledge its responsibility for the failing sheet pile wall and agree to indemnify the Group (i) by reimbursing the Group for costs incurred and (ii) either performing or paying for repair of the wall.  *Id.*

111.  AMEC EE failed to accept responsibility for the failure of the wall as described in the Group's December 2014 letter.  Instead, AMEC EE responded only by requesting that all further communications on the matter be directed to in-house legal counsel.

112.  On June 2, 2015, counsel for the Group wrote to counsel for AMEC FW informing him about the Group's plans to issue a request for proposal seeking a contractor to perform the wall repair required by EPA, and requesting that AMEC FW inform the Group before the end of June 2015 if it wished "to limit its exposure by performing the repair work itself." Ex. 15.  The letter also reiterated the December 2014 demand that AMEC FW reimburse the Group and perform or pay for repair of the wall:  "the PRP Group will hold AMEC responsible for all costs that have been and will be incurred to assess the damage and repair the wall." *Id.* at 2.

113.  AMEC EE did not accept the Group's demand to perform or pay for the wall repair work.

114.  Starting in May 2014, the Group put AMEC EE on notice of the need to repair the sheet pile wall.  In December 2014 and June 2015, the Group put AMEC FW on notice of AMEC EE's defective design of the wall, and of AMEC EE's legal and contractual obligations to perform or pay for the wall repair and to indemnify the Group against claims by EPA that the repair was required to stop releases of hazardous substances from the Site to the environment and to prevent releases that were threatened due to failure of the wall.

115.  To the best of the Group's knowledge, neither AMEC EE nor its insurers have agreed to honor their obligation to defend and indemnify the Group and its members from EPA's demands for a response to the releases and threatened releases attributable to AMEC EE's defective design of the sheet pile wall.

116.  Since mid-2014, the Group has worked with EPA and the Group's contractors to develop and implement a plan for repairing the sheet pile wall.  In late October 2014, the Group submitted to EPA a sheet pile wall repair work plan that identified the problems with the wall and proposed repair work consistent with RAC's August 2014 recommendations. ENVIRON Int'l Corp., Sheet Pile Wall Repair Work Plan (Oct. 2014), Ex. 16.

117.  In response to comments from EPA, the Group's consultants submitted to EPA a response to comments and an amended repair plan in November 2014.  ENVIRON Int'l Corp., Sheet Pile Wall Repair Work Plan (Revision No. 1 Nov. 2014), Ex. 17.  EPA approved the revised work plan in January 2015.

118.  EPA's comments on the work plan included a request for additional actions to mitigate potential impacts to the aquatic environment associated with the proposed repairs. The Group and its consultants responded to EPA's concerns with explanations why such additional actions would not be needed.  EPA accepted the Group's justification.  The

Group's efforts to forego additional actions and costs mitigated the damages for which AMEC EE is responsible to the Group.

119.   Following EPA's approval of the wall repair work plan, the Group and its consultants prepared detailed technical specifications and drawings.  ENVIRON submitted those documents to EPA for approval in April 2015.

120.   EPA and the Army Corps of Engineers commented on the draft specifications and drawings.  In response, the Group and its consultants submitted revised documents and additional details about the proposed repairs in July 2015.

121.   In August 2015, EPA approved the Group's specifications and drawings and directed the Group to retain a contractor to perform the repair work.

122.   The Group retained Creamer Environmental Inc. ("Creamer") to construct the repairs to the sheet pile wall.  Environmental Services Agreement between Cottman Avenue PRP Group and Creamer Environmental Inc. (Jan. 29, 2016).  Ex. 18.

123.   Creamer performed the repair work during the summer of 2016.  Creamer repaired the damaged walers and placed 5,059.6 tons of R6 stone on the river side of the wall.

124.   The Group paid Creamer $1,031,854.54 to construct the wall repairs under the Environmental Services Agreement.

125.   On August 26, 2016, on behalf of the Group, its consultant Ramboll Environ submitted to EPA a report that "summarizes and documents the sheetpile wall repair construction activities completed at the [Site] between May 2 and July 13, 2016."  Metal Bank Sheetpile Wall Repair Construction Certification Report at 1 (Aug. 26, 2016).  Ex. 19.

126.   On December 7, 2016, EPA's remedial project manager issued a letter to the Group's consultant Ramboll Environ stating that the sheet pile wall repair was necessitated by

"structural defects" of the wall, including "damage to components of the wall that were most likely caused by movement of the wall toward the adjacent Delaware River." EPA found that the Group repaired the wall in compliance with its obligation under the Utility CD to present and implement a new design for the sheet pile wall, and that EPA had approved the design and implementation of the sheet pile wall repairs. Letter from William Geiger, Remedial Project Manager, EPA Region III, to Nicholas Steenhaut, Ramboll Environ (Dec. 7, 2016). Ex. 20

127. EPA determined that the sheet pile wall AMEC EE designed and engineered pursuant to the 1998 and 2003 Contracts was inadequate for its intended purpose.

128. EPA determined that the sheet pile wall AMEC EE designed and engineered pursuant to the 1998 and 2003 Contracts presented a threat of release of hazardous substances into the environment.

129. As a result of AMEC's defective design of the sheet pile wall, Plaintiffs have incurred and are continuing to incur response costs and attorneys' fees to investigate the wall's failure, to design and construct a repair of the wall, to maintain and monitor the repair, and to enforce AMEC's warranties and other contractual obligations under the 1998 Contract and 2003 Contract. Plaintiffs also will incur future response costs for maintenance and monitoring of the repaired wall.

## COUNT I – BREACH OF WARRANTY

130. Plaintiffs incorporate by reference paragraphs 1-129 as if fully set forth herein.

131. Each of AMEC EE's promises identified in paragraphs 3, 5, 6, 7, 12, 15 and 20 of the 1998 and 2003 Contracts, respectively, were an inducement for the Group to enter into the

1998 and 2003 Contracts, respectively.  As such, they are enforceable against AMEC EE as express warranties.

132.  AMEC EE breached each of these express warranties by failing to engineer and design the sheet pile wall as AMEC EE warranted.

133.  AMEC breached the express warranty that it would conduct its activities in a safe and professional manner in compliance with EPA's Administrative Order and all applicable statutes, ordinances, orders, rules and regulations of the federal, state and local governments in whose jurisdiction such activities were performed.

134.  AMEC breached the express warranty that it would conduct its activities in accordance with accepted professional standards for engineering and scientific practices adopted by environmental firms performing services of a similar nature in effect at the time Services were rendered.

135.  AMEC breached the express warranty that its services would be accurate and free from defects due to materials, workmanship and/or design in accordance with such professional standards.

136.  AMEC EE also gave to Plaintiffs an implied warranty that its designs and specifications would give the sheet pile wall a reasonable fitness for its intended purpose.

137.  AMEC EE breached this implied warranty by failing to design the wall to perform as intended during low flow conditions.

## COUNT II – BREACH OF CONTRACT

138.  Plaintiffs incorporate by reference paragraphs 1-137 as if fully set forth herein.

139. Each of AMEC EE's promises identified in paragraphs 3, 5, 6, 7, 12, 15 and 20 of the 1998 and 2003 Contracts, respectively, were contractual undertakings and, accordingly, enforceable contractual obligations of AMEC EE.

140. If or to the extent any of AMEC EE's promises identified in paragraphs 3, 5, 6, 7, 12, 15 and 20 of the 1998 and 2003 Contracts, respectively, are found by the Court not to have been an inducement for the Group to enter into the 1998 and 2003 Contracts, respectively, those promises nevertheless are contractual undertakings and, accordingly, enforceable contractual obligations of AMEC EE.

141. AMEC EE breached each of these contractual obligations. Its design and engineering of the sheet pile wall were defective for the purpose intended and as agreed by contract. AMEC EE did not design or engineer the sheet pile wall to the specifications of the ROD, Administrative Order, RFP, revised remedy or Utility CD, as required under the contracts.

142. AMEC EE agreed that, if any of its completed services failed to conform to the professional responsibility standards under the 1998 and 2003 Contracts, at its expense it would perform corrective services of the type originally performed as may be required to correct any such defective services of which AMEC EE was notified by the PRP Group in writing at any time during the performance of the Project.

143. AMEC EE breached this obligation in the 1998 and 2003 Contracts by failing to correct its defective services after the PRP Group notified AMEC EE of them.

144. AMEC EE agreed to defend, indemnify and hold the PRP Group harmless from and against any and all claims, losses, damages, liability, costs or actions, including, without limitation, reasonable attorney fees and other costs and expenses arising out of, resulting from

24

or in connection with any unlawful, negligent or willful misconduct or omission by AMEC EE, its agents, employees or subcontractors, in the performance of the Contracts.

145. AMEC EE breached this obligation in the 1998 and 2003 Contracts by failing to defend, indemnify and hold the PRP Group harmless against (i) claims by EPA that repair of the sheet pile wall was required to stop releases of hazardous substances from the Site to the environment and to prevent releases that were threatened due to a complete failure of the wall attributable to AMEC's defective design, (ii) losses, damages and costs associated with the investigation, planning and repair of the wall required to remedy AMEC's defective design, and (iii) liability under CERCLA and the Utility CD for releases and threatened releases of hazardous substances attributable to AMEC's defective design.

146. AMEC EE breached its obligation to defend, indemnify and hold the PRP Group harmless in each instance that it failed and refused to respond affirmatively to the Group's demand that AMEC EE acknowledge its responsibility for the failing sheet pile wall and agree to indemnify the Group (i) by reimbursing the Group for costs incurred and (ii) either performing or paying for repair of the wall, as that demand was set forth in Group counsel's letters of December 12, 2014 and June 2, 2015.

147. AMEC EE also agreed in the 1998 and 2003 Contracts to secure and maintain insurance policies protecting AMEC EE and the Group and, with respect to CGL insurance, naming the Group and EPA as additional insureds.

148. AMEC EE's obligation to defend, indemnify and hold the Group harmless included the obligation to put its insurance carriers on notice of the Group's claims and to invoke the terms of the relevant policies for the benefit of the Group, EPA and AMEC EE itself.

149.  Neither AMEC nor any of its carriers has notified the Group that it would agree to indemnify and hold harmless the Group from losses and damages sustained as a result of the claims and resulting costs described herein.

150.  To the extent that AMEC EE failed to secure and maintain the required insurance coverage or failed to put its insurance carriers on notice or otherwise failed to invoke properly the terms of the insurance coverage, AMEC EE breached its contractual obligation by failing to secure, maintain and invoke the CGL, professional errors and omissions and excess liability policies.

## COUNT III – CERCLA § 113(f)(3)(B) CONTRIBUTION

151.  Plaintiffs incorporate by reference paragraphs 1-150 as if fully set forth herein.

152.  The 1998 and 2003 Contracts provide for the design by AMEC EE of EPA's approved remedy for the final disposal and treatment of hazardous substances at the Site.

153.  Under the Contracts, AMEC EE designed and oversaw the engineering of its design to provide for such final disposal and treatment of hazardous substances at the Site.  AMEC EE agreed to design the sheet pile wall to comply with the Utility CD and the Revised Remedial Plan and in a manner that would fulfill AMEC EE's contractual obligations to the Group.  As described in paragraphs 23-26, 35-39 and 69-70 of this Complaint, the sheet pile wall is a component of the system for treatment of hazardous substance-containing oils, by channeling and collecting these oils for disposal, by treating any remaining hazardous substances in place, and by preventing their release into the Delaware River.

154.  The members of the Group are obligated under the Utility CD to design, construct operate and maintain the remedy for the Site, including the design, construction, operation and maintenance of the sheet pile wall component of the remedy.

155.  As parties to the Utility CD, and pursuant to section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B), the members of the Group are entitled to contribution from any other person who is liable under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for response costs that they incur at the Site.

156.  Upon information and belief, following construction of the remedy by TTEC and Sevenson, hazardous substances were released into the environment outside the sheet pile wall as a result of the defective design of the wall by AMEC EE.

157.  The defective design of the sheet pile wall by AMEC EE gave rise to threatened releases of hazardous substances into the environment outside the wall.

158.  AMEC EE is liable under Section 107(a)(3) of CERCLA as a "person who by contract … arranged for disposal or treatment … of hazardous substances owned or possessed … by another party or entity at" the Site.  42 U.S.C. § 9607(a)(3).

159.  AMEC EE is a "person" and a "response action contractor" under CERCLA.  42 U.S.C. § 9619(a).  Under Section 119(a)(2) of CERCLA, a response action contractor shall be liable for costs incurred in response to a release caused by its negligence, gross negligence, or intentional misconduct.  AMEC EE's negligence caused or contributed to the release and threatened release of hazardous substances from the Site to the environment.

160.  The Group has incurred costs responding to the release and threatened release of hazardous substances from the Site to the environment attributable to AMEC EE's defective design of the sheet pile wall.  These costs were necessary and were incurred consistent with the National Contingency Plan, 40 C.F.R. Part 300 (the "NCP"), and with the Utility CD.  The Group continues to incur necessary response costs to operate, maintain and monitor the sheet

pile wall and the repairs required to remedy AMEC EE's defective design. These costs also are consistent with the NCP and the Utility CD.

161. AMEC EE is liable to Plaintiffs for contribution toward the costs Plaintiffs have incurred and are incurring in response to the release and threatened release of hazardous substances into the environment as a result of AMEC EE's faulty sheet pile wall design and engineering.

## COUNT IV – CERCLA § 113(g)(2) DECLARATORY JUDGMENT

162. Plaintiffs incorporate by reference paragraphs 1-161 as if fully set forth herein.

163. AMEC FW is liable pursuant to Sections 107(a) and 119(a)(2) of CERCLA, 42 U.S.C. §§ 9607(a) & 9619(a)(2), for all reasonable and necessary response costs that the Group and each of its members have incurred and will incur in the future at the Site consistent with the NCP.

164. Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), empowers this Court to enter a declaratory judgment on the liability of Defendant for response costs that will be binding on any subsequent action or actions to recover further response costs.

165. An actual, substantial and justiciable controversy exists between the Group and its members, on the one hand, and Defendant AMEC FW, on the other hand, regarding the liabilities of each for such response costs that will be incurred in connection with the release or threatened release of hazardous substances at the Site. A judicial declaration setting forth the parties' rights and obligations with respect to these costs and damages will serve to terminate the uncertainty and controversy concerning liability for such future costs.

166. Consequently, AMEC FW should be adjudged liable for any and all reasonable and necessary costs of response incurred in a manner consistent with the NCP by the Group or any of its members in the future in connection with the design of the sheet pile wall.

## **PRAYER FOR RELIEF**

1.     Plaintiffs ask the Court for a judgment that AMEC FW is liable to Plaintiffs for all costs they have incurred to investigate, design and construct the repairs to the sheet pile wall, in an amount not less than $1.5 million, as a remedy for AMEC EE's breach of warranties and breach of contract.

2.     Plaintiffs ask the Court for a judgment that AMEC FW is liable to Plaintiffs for all attorneys' fees incurred to address the defective remedial design and the need for repair of the sheet pile wall and to enforce Plaintiffs' contractual rights, in an amount not less than $220,000, as a remedy for AMEC EE's breach of contract.

3.     Plaintiffs seek indemnification from AMEC FW against all claims, losses, damages, costs and liabilities arising from and related to AMEC EE's defective design of the sheet pile wall.

4.     Plaintiffs request contribution from AMEC FW under Section 113(f)(3)(B) of CERCLA for response costs incurred to address AMEC EE's defective design and the need for repair of the sheet pile wall.

5.     Plaintiffs request a declaratory judgment under Section 113(g) of CERCLA that AMEC FW is liable to Plaintiffs for all future response costs to address AMEC EE's defective design, the repair of the sheet pile wall, and operation, maintenance and monitoring of the wall repairs.

6.    Plaintiffs request such other and further relief as the Court may deem just and

proper.

Dated:  December 23, 2016

Respectfully submitted,

COTTMAN AVENUE PRP GROUP,
BALTIMORE GAS & ELECTRIC COMPANY,
CONSOLIDATED EDISON COMPANY OF
NEW YORK, INC., JERSEY CENTRAL
POWER & LIGHT COMPANY, LONG
ISLAND LIGHTING COMPANY d/b/a LIPA,
METROPOLITAN EDISON COMPANY,
ORANGE AND ROCKLAND UTILITIES,
INC., PECO ENERGY COMPANY,
POTOMAC ELECTRIC POWER COMPANY,
PPL ELECTRIC UTILITIES CORPORATION,
PUBLIC SERVICE ELECTRIC AND GAS
COMPANY, and VIRGINIA ELECTRIC AND
POWER COMPANY

BY:  _____
Dawn Getty Sutphin
Pennsylvania Bar No. 57541
852 11th Avenue
Prospect Park, Pennsylvania  19076
(610) 616-2259
sutphindg@gmail.com

Jeffrey N. Martin
    (Motion to Appear *Pro Hac Vice* forthcoming)
Hunton & Williams LLP
2200 Pennsylvania Avenue NW
Washington, D.C.  20037
(202) 955-1552
jmartin@hunton.com

30

Dan J. Jordanger
   (Motion to Appear *Pro Hac Vice* forthcoming)
Hunton & Williams LLP
951 East Byrd Street
Riverfront Plaza, East Tower
Richmond, Virginia  23219
(804) 788-8609
djordanger@hunton.com

*Counsel for Plaintiffs*

31